IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Moretha Harding, *et al.*,  Case No. 3:06CV684

        Plaintiffs,

  v.  ORDER

City of Toledo, *et al.*,

        Defendants.

This is a housing discrimination case. Plaintiffs are three disabled individuals (Timothy Miller, Dana Howey, and Gerald Oakes) who live at 3842 Talmadge Avenue in Toledo, Ohio, and Moertha Harding, the operator of the adult living home in which they reside. Defendants are the City of Toledo, Mayor Carlton Finkbeiner, Rosalie L. Reynolds, and Doukides Properties, LLC.

Plaintiffs contend the defendants are violating the Fair Housing Act of 1988, the Rehabilitation Act of 1974, the Civil Rights Act of 1981, the Americans with Disabilities Act, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §1983, and O.R.C. § 4112 *et seq*.

Pending is plaintiffs' motion for a preliminary injunction to prevent defendants from, *inter alia*, taking actions that would lead to the residents' removal from the home on Talmadge Avenue. For the following reasons, the motion will be denied.

**Factual Background**

The City of Toledo has an ordinance requiring at least 500 feet between group homes. Harding operates a group home on Talmadge Avenue and another on Graceway Avenue. The two

homes are within 500 feet of each other. Doukides Properties owns the Talmadge Avenue home and leases it to Harding.

Neighbors complained about the Talmadge Avenue home. This prompted Toledo officials to charge Doukides Properties on April 27, 2005,with a misdemeanor violation of the Toledo Municipal Code Ordinance § 1117. Doukides Properties pleaded no contest on December 9, 2005.

The Toledo Housing Court postponed imposing sanctions pending further proceedings.

In response to the City's actions, Doukides Properties instituted eviction proceedings against the plaintiffs. On March 28, 2006, I granted a temporary restraining order to prevent Doukides Properties from engaging in any proceeding or actions to evict the plaintiffs from the home at 3842 Talmadge Avenue.

Doukides Properties states the only reason it is attempting to evict the plaintiffs is because of the City's enforcement efforts regarding the minimum spacing requirements of group homes. Harding's lease with Doukides Properties for the Talmadge Avenue house expires on June 8, 2006.

Plaintiffs claim the lease actually expires on February 28, 2007. This was the date on which the plaintiffs' original lease with Doukides Properties was to expire. Plaintiffs contend that the lease with the earlier expiration date, which was signed on December 9, 2005, is substantively and procedurally unconscionable.[1]

---

[1] Plaintiffs argue in their reply brief that defendant Panos Doukides offered to give Harding a ride home from housing court on that date but – once Harding was in the car – refused to take her home until she signed a new lease. Doukides's wife, Susan, was allegedly in the car at the time. Plaintiffs state Doukides drove Harding to OfficeMax, wrote up a new lease, and ordered Harding and Susan Doukides to sign the new lease. Plaintiffs contend Doukides refused to take Harding home until she signed the new lease. Plaintiffs' arguments regarding the lease for the Talmadge Avenue home with Doukides Properties are, at least for purposes of their preliminary injunction motion, untimely, and therefore are not before me now.

On May 30, 2006, the same day on which eviction proceedings against the plaintiffs were to continue, I held a telephonic conference with the parties, orally denied plaintiffs' request for a preliminary injunction, and stated that a subsequently issued order would describe the reasoning behind my decision. This is that order.

## Discussion

A preliminary injunction is appropriate if: 1) the plaintiff has established a substantial likelihood or probability of success on the merits; 2) there is a threat of irreparable harm to the plaintiffs; 3) issuance of the injunction would not cause substantial harm to others; and 4) the public interest is best served by granting injunctive relief. *Chabad v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004); *Nightclubs, Inc. v. City of Paducah*, 202 F.3d 884, 888 (6th Cir. 2000).

In analyzing whether an injunction is warranted, I do not need to make specific findings for each of the four factors outlined above if fewer factors are determinative. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003). When weighing the factors, I apply a clear-and-convincing evidence standard. *See, e.g., Smyth ex rel. Smyth v. Rivero*, 282 F.3d 268, 276 (4th Cir. 2002).

### 1. Likelihood of Success on the Merits

### a. Interpretation of State and Municipal Law

Ohio law permits political subdivisions to enact ordinances to limit the concentration of adult family homes. O.R.C. § 3722.03(D)(1). Toledo has done so with T.M.C. § 1104.1001, which provides that "group living facilities" (as defined in T.M.C. § 1116.0220) "must be at least 500 feet from a site with any other Group Living Facility."

T.M.C. § 1116.0220 defines "group living":

> Group Living
> Residential occupancy of a structure by other than a Household, where units or quarters do not each have its own kitchen facilities . . .
> (A) Adult Family Home
> A state-licensed home or facility that provides accommodations to three to five unrelated adults and supervision and personal care services to at least three of those adults. Revised Code Sec. 3722.01(A)(1).

The City contends that Harding's facility, as a state-licensed "adult family home" is within the definition of T.M.C. § 1116.0220(A), and thus, under T.M.C. § 1104.1001, cannot be within 500 feet of another such facility. The ability of the City to impose the space limitation, the City contends, derives from O.R.C. § 3722.03(D)(1), which expressly authorizes enactment of ordinances limiting the spacing of adult family homes.

Plaintiffs claim that the City's efforts to enforce its zoning ordinances directly against Doukides and indirectly against them violate the Fair Housing Act's protections against discrimination on the basis of disability. These claims involve consideration of federal, state, and municipal law. I begin by analyzing plaintiffs' interpretation of City Code provisions.

Plaintiffs claim that another provision of the Toledo Code, namely T.M.C. § 1115.0906, operates to exempt plaintiffs' residence from the Group Living provisions (which contain the 500-foot restriction).

T.M.C. § 1115.0906, on which plaintiffs rely, provides:

> Living arrangements for persons with a "handicap" and/or a "disability" as those terms are defined by the Fair Housing Amendments Act of 1988 (42 U.S.C. Sec. 3601, *et seq*.) and the Americans With Disabilities Act of 1990 (42 U.S.C. Sec. 12101, *et seq*.) *will be presumed to be a household*.

(Emphasis added).

There are no limitations in the Toledo Municipal Code on the concentration of "households," and, if the Talmadge Avenue home is a "household" (as opposed to an adult group home) for purposes of city ordinances, the 500-foot spacing requirement would not apply.

In other words, the plaintiffs contend that, even though Harding operates and the individual plaintiffs live within a state-licensed group living facility, the Toledo Code definition of such facility expressly covers "[r]esidential occupancy of a structure by *other than* a household." T.M.C. § 1116.0220 (emphasis added). Thus, plaintiffs argue that T.M.C. § 1115.0906 precludes the City's efforts to enforce the 500-foot spacing requirement because disabled people living together are presumed to be a household, and therefore would not be considered an adult care facility.

I disagree with plaintiffs' interpretation of the City's Code provisions.

First, § 1115.0906 simply creates a *presumption* that such arrangements constitute a "household."

5

That presumption, however, can be overcome.[2] Here, the presumption is overcome by the fact that the plaintiffs' residence operates under a state license. Indeed, plaintiff Harding acknowledged at the hearing that, if she did not have the license, the individual plaintiffs could not reside in the facility.

Plaintiffs' facility is not, therefore, a "household" because of its state-licensed status, and, consequently, Harding needed to comply with the requirements and restrictions imposed as a predicate to licensure.

Section 1115.0906 of the Toledo Municipal Code can be harmonized with the Code's provisions relating to group living, and imposing the 500-foot limit, by noting that § 1115.0906 does not, unlike § 1116.0220(A), make any reference to supervision and care.

In other words, § 1115.0906 protects persons who are handicapped or disabled who are living together from being discriminated against on the basis of their condition and desire to live together. This provision says nothing about in-residence supervision or care – which Harding provides per her license and operation of the facility.

The Code provisions at issue, consequently, are not at odds with one another – they are complimentary. One relates to state-licensed *care* facilities, which cannot be within 500 feet of another such facility, and the other protects persons with disabilities who are able to care for themselves and wish to live with other such persons from being subjected to discrimination. When

---

[2] Plaintiffs argue that T.M.C. § 1115.0906 creates a presumption that is mandatory and cannot be rebutted. I disagree. The use of the word "will" does not, in my opinion, necessarily make the presumption impossible to rebut. The ordinance does *not* say that a group of disabled people living "will be a household." In short, it is reasonable to view the ordinance as operating in the following manner: disabled people living together will be presumed to be a household, and that presumption will prevail absent other evidence contradicting it, such as a state license for an adult group home.

such persons who can care for themselves live together, they cannot be forced to move elsewhere if there happens to be a group living (i.e., care) facility within 500 feet of their premises.

Therefore, I do not believe that plaintiffs' interpretation of the City Code provisions at issue here is correct. The plaintiffs have not met their burden of persuading me that they have the necessary likelihood of prevailing on the merits as to their interpretation of those provisions.

### b. Interpretation of Federal Law

Plaintiffs allege defendants are violating the Fair Housing Amendments Act of 1988, the Rehabilitation Act of 1974, the Civil Rights Act of 1981, the Americans with Disabilities Act, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. §1983, and O.R.C. § 4112 *et seq*.

The City Code provisions appearing valid, plaintiffs' substantive due process rights are not being violated by the City's efforts to enforce those provisions against Doukides. To the extent that plaintiffs' substantive due process challenge contends that the 500-foot limitation is inherently or otherwise discriminatory, I disagree: Plaintiffs have cited no case in support of that contention and the cases cited involve much greater space restrictions. Indeed, plaintiffs' own counsel were involved in a settlement before Judge David A. Katz that agreed to the 500-foot limitation. (*See* Doc. 9, Ex. C).[3] In view of that settlement, the 500-foot limitation should be viewed, in my opinion, as presumptively legitimate.

For purposes of the pending motion, I conclude that the City is not violating state and federal laws that prohibit discrimination against people with disabilities. To be sure, two cases cited by

---

[3]

The City originally required a 990' buffer between adult group homes for disabled people. Residents, at least one of whom was represented by plaintiffs' counsel, Advocates for Basic Legal Equality, Inc., entered a settlement agreement with the City reducing the buffer requirement to 500 feet.

plaintiffs invalidated spacing requirements for adult care facilities for disabled people. *See Larkin v. State of Mich., Dep't of Soc. Servs.*, 89 F.3d 285, 291 (6th Cir. 1996) (invalidating a 1,500-foot spacing requirement for group homes for mentally retarded adults); *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 787 (7th Cir. 2002) (holding that a 2,500-foot spacing requirement for adult care facilities for disabled people was invalid). But the buffer zones required in those cases were significantly greater than the 500-foot buffer currently required by Toledo.

Plaintiffs also argue the City has failed to reasonably accommodate them as requested. The FHAA requires accommodation if such accommodation is 1) reasonable, and 2) necessary 3) to give disabled people equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B); *Oconomowoc Residential Programs*, 300 F.3d at 783 (citations omitted). The requirements for reasonable accommodation under the ADA are the same as those under the FHAA. 42 U.S.C. § 12131(2); *Oconomowoc Residential Programs*, 300 F.3d at 783 (citations omitted).

Plaintiffs have the burden to show that the accommodation sought is reasonable. *Oconomowoc Residential Programs*, 300 F.3d at 783 (citations omitted). "An accommodation is unreasonable if it [. . .] requires a fundamental alteration in the nature of the program." *Id.* at 784.[4] An accommodation is necessary if, without it, the plaintiffs would "be denied the equal opportunity to live in a residential neighborhood." *Id.* at 783. "'Equal opportunity' means the opportunity []to live in a residential neighborhood." *Id.*

Disabled people in Toledo have the same opportunities to live in group homes as non-disabled people do. The City Code provisions at issue apply to all types of group homes: the

---

[4] An accommodation also is unreasonable if the benefits provided by the accommodation were outweighed by its costs and the administrative burden created. Eliminating the buffer requirement altogether would not increase the City's administrative burden.

definition of "adult family home" does not require the residents to be disabled, only that at least three of the unrelated adults in the facility receive "supervision and personal care services." T.M.C. § 1116.0220. As such, the Code provisions do not only target facilities that house disabled individuals.

The accommodation requested here is *not* necessary for disabled people to have the equal opportunity to live in a residential neighborhood: Disabled people who do not need to live in adult care facilities can live together anywhere in Toledo because they are presumed to be a household.[5]

Under the same reasoning, the distance requirement does not deny disabled people equal opportunity to reside in a residential neighborhood because the requirement applies to group homes providing care for the residents, not to individuals with disabilities.

It may be true that, as other courts have noted, many disabled people cannot live independently and therefore need to live in adult group homes or care facilities. *Larkin*, 89 F.3d at 291; *Oconomowoc Residential Programs*, 300 F.3d at 784. It is also true that "[w]hen a zoning authority refuses to reasonably accommodate these small group living facilities, it denies disabled persons an equal opportunity to live in the community of their choice." *Oconomowoc Residential Programs*, 300 F.3d at 784.

Nonetheless, the 500-foot spacing requirement at issue here is reasonable. The City reduced its buffer for adult family homes from 990 feet to 500 feet in accordance with a settlement agreement. Plaintiffs seem to argue that all regulations treating state-licensed group homes and care

---

[5] In the alternative, the accommodation requested is unreasonable because it would fundamentally alter the nature of the City Code provisions by, in essence, overriding a judicially-approved buffer requirement. As mentioned above, I believe the 500-foot limitation – which originated in a settlement agreement approved by Judge Katz – is at least presumptively legitimate. The City is not acting improperly in seeking to enforce it.

facilities for disabled people differently than other households are barred by laws prohibiting discrimination against the disabled. Taken to its logical conclusion, plaintiffs' approach would prohibit cities from enacting ordinances limiting the concentration of any kind of care facility – including, but not limited to, group homes – that houses disabled people.

I do not view *Larkin* and *Oconomowoc Residential Programs* as interpreting federal law to ban *all* limits on the concentration of group homes housing disabled people. Plaintiffs have provided no basis for concluding that Congress intended federal law to sweep so broadly as to prohibit reasonable regulations governing the concentration of licensed care-facilities for disabled people. I will not infer such a broad, all-encompassing consequence in the absence of an explicit expression of congressional directive.

This leaves plaintiffs' procedural due process claim. That claim is, as I understand it, that the plaintiffs' rights to due process were abridged when the City prosecuted Doukides Properties, and thereby is forcing Doukides to bring eviction proceedings against the plaintiffs. The City is not violating plaintiffs' procedural due process rights. Indeed, plaintiffs can assert (and have asserted) whatever defense they want in the eviction proceedings.[6]

I conclude, therefore, that plaintiffs have not shown a likelihood of prevailing on the merits of their claims. While I analyze the other factors below, it is this factor that primarily leads me to deny plaintiffs' request for a preliminary injunction: there is no point in granting an injunction for a cause that is unlikely to later prevail.

---

[6] For example, plaintiffs are free to argue that the lease with the June 8, 2006, expiration date is unconscionable and that the earlier lease is therefore valid.

**2. Irreparable Harm**

Without an injunction, the residents of the Talmadge Avenue home will have to move someplace else. I am aware of the difficulty and discomfort these residents face. That said, Harding and Doukides Properties were on notice of, but ignored, the City Code provisions at issue here. They, therefore, are primarily responsible for creating the problem now facing the residents. Additionally, it is not as if the City has completely closed all neighborhoods to adult group homes. When viewed in light of the fact that plaintiffs are not likely to succeed on the merits, this factor does not tip the scale in the plaintiffs' favor. Moving out of a home or apartment one likes is not an unbearable hardship, even though it often is distressful.

**3. Harm to the City if the Injunction Were Granted**

The City seeks to regulate the concentration of adult group homes for the disabled. Were I to grant the injunction, the City's efforts, which at this stage appear entirely lawful, to regulate the concentration of adult group homes for disabled people would be impaired – and perhaps permanently so.

**4. The Public Interest**

Plaintiffs argue the public interest is best served by granting the injunction and preventing the City from discriminating against disabled people by regulating the concentration of adult group homes for such persons. The City argues the public interest is best served by protecting its ability to lawfully control the concentration of such homes. I agree with the City, whose residents, moreover, properly expect that the City will enforce its valid zoning ordinances.

**Conclusion**

For the foregoing reasons, it is therefore,

ORDERED THAT plaintiffs' motion for a preliminary injunction be, and the same hereby is, denied.

A status/scheduling conference is set for June 19, 2006 at 2:00 p.m.

So ordered.

/s/ James G. Carr
James G. Carr
Chief Judge
